The next argument will be in case number 24-26-27 in Re Dussan David Kipperband et al. Mr. Park, whenever you're ready. At police court, my name is Ty Park, Ty Park, PLLC. I'm accompanied by my colleague, Peter Bryce of Whiteman-Osterman in Albany. We represent the intervener appellant, Marlon Kipperband, in this appeal from the district court's order granting a 1782 petition for judicial assistance. There are proceedings in Argentina that's been going on, your honors, for over 20 years. Can you give us an update on the status of those proceedings? Sure. I understand that they're both ongoing, although your brief said that they're effectively dismissed, and I'm not sure what you meant by that. Okay. So here's what happened, Judge. When the district court below issued the order granting the judicial assistance, the Argentine proceedings had essentially come to a stop because the Argentine judge held that the pleadings that the appellees had filed in Argentina were procedurally defective. The judge said you need to do certain things in order for this to become essentially live or effective. Rather than addressing those procedural defects, two days later, they were here in U.S. District Court in front of Judge Hellerstein seeking judicial assistance for essentially the same requested discovery. Now, what's happened since then, just to – I'm sorry, Judge, just – what's a little confusing is that since that order was issued by Judge Hellerstein, further proceedings in Argentina continued where it appears now that the proceedings are now going on again in Argentina, which raised the question which we have been asking from day one. Why are the appellees here in the United States? Well, you haven't contested – you haven't contended that an Argentine subpoena would be honored by the banks, have you? You have not made that argument. You didn't make it in front of Judge Hellerstein, and in fact, when you moved to re-argue, you specifically noted in J.A. 2-9 that you hadn't made that argument. I'm sorry. I'm not – we have not contested. You have not argued that in the Argentine court an Argentine subpoena would reach the banks and propel the banks to produce the documents there. We actually have, Your Honor, for two reasons. You did not make that argument when you moved to re-argue in front of Judge Hellerstein. That's true, Judge. That's a simple question. Did you make that argument in front of Judge Hellerstein? We did not. Not that argument. Then why didn't you? Because Judge – one thing about Judge Hellerstein's orders, it seems to not talk about that issue. And the problem is that that's never been an issue that you've interjected into these proceedings. So – Unlike Kievel. This is not Kievel. Kievel is a situation where there's a difference with regard to Netherlands law and U.S. law and with regard to what was available or discoverable. That's what Kievel is all about. This is not Kievel. There's no claim – there's no claim here that an Argentine court could bring those documents in front of them. That's what 1782 is all about. People come to the United States seeking discovery of documents that they can't get – that'll be used in a foreign proceeding because they can't get them in the foreign proceeding. So that's exactly right, Judge. Right. Well, thank you. But here's – I appreciate that. Well, here's the thing. Glad to know that I understand the statute. Well, here's the thing, Judge. The subpoenas at issue here would not have been granted by the Argentine judge for the simple reason that they're asking from 14 financial banks documents dating back to 22 years. And so we made a separate argument on – That's a different issue. The question I asked you was not about its invasiveness or the broadness of it. The question I asked you was one of authority, and you've agreed with me that an Argentine – that issue was never raised in front of the Argentine – in front of Judge Hellerstein saying, look, Argentina can't – Argentina would not subpoena these, would not allow them to be used in an Argentine proceeding. We have not made that argument.  So what you're arguing is about oppressiveness or overbreadth. The banks have not – one single objection to these. The banks aren't here saying these are oppressive. They're overly broad. We can't deal with this. The banks have not raised one single objection. Now, maybe if we send this back to Judge Hellerstein, if that's one of the things you're asking for, there could be some pairing on this. That might be one concern about it. But that's not a reason to not allow the discovery to proceed. Well, Your Honor, just in February 20th of this year, this Court – this Court affirmed Judge Engelmeyer's separate decision in Re Ex Parte Klein, which we cite extensively in our briefs and before Judge Hellerstein, in which the Court held the following. If the discovery that they're seeking here could be achieved in the other foreign jurisdiction, the first intel factor militates against the grant of the petition. This is a repeat of what I just asked you in which you told me, A, you didn't raise the issue. B, if you had simply raised in front of Judge Hellerstein the issue that was in front of Judge Engelmeyer, that is, this could happen in Argentina. You didn't say that to Judge Hellerstein. Excuse me. Nor did you say it in your brief here. No, we did, Your Honor. Tell me the page that you did. What we didn't do – Just tell me the page – answer my question. Tell me the page that you did here, raise that argument in this case. Your Honor, I'm sincerely confused as to which issue we're talking about. The issue, which is, should this – could these same discovery requests have been made in Argentina, was an issue we raised over and over again to Judge Hellerstein in our motion to Quash and in our briefs. The thing that we did not do, Judge, which you're right, we did not say that the subpoenas as drafted could have been issued by the Argentine judge in Argentina. We did not make that argument, which is what I understood, Your Honor, to be first asked. But these are different issues. These are different issues. Because the Kiobo and the ex parte client judgment that this Court issued just in February related to what is it that the appellees are seeking to get. And what they're – Wait a second. This Court issued an ex parte order? No, no, no. This court, this court affirmed an ex parte. Okay. It affirmed Judge Engelmeyer's decision, which was called in re ex parte client. Oh. Okay. Sorry, Judge. That's all right. So what they're seeking here is an effort, a discovery for purposes of tracing, according to them, tracing assets that was allegedly misappropriated in 2002. So in order to do that, what they're asking is for a whole Blumberg bus subpoena on 14 – Well, don't you think it would make sense that you'd want to look at the transactions if they claim that – if the claim is that the brother and the sister had access to this group of money, the Kai or whatever – Akiba, yes. And they've had it now for 20-plus years, and that they've distributed it. And much of it may have been run through U.S. dollars. The best place to look for it is in the United States, in the bank records of banks that would have been working at the Fed window in New York. If it were tailored to that effect, Your Honor, that would be – that may help some there. We know that this entity existed. Yes. We know it was created by the grandfather – the grandfather or father, depending on who you're talking about. And we know that it was not part of the estate at the distribution, right? That's the claim. Correct, correct. That's the claim, Your Honor. That's the claim that's been in the Argentine courts for 22 years. And at the time – at the time of the argument in front of Judge Hallerstein, did you say to Judge Hallerstein, let them subpoena this in Argentina? They can do that. Did you say that to Judge Hallerstein? We didn't say that. What we did do, Judge, what we did do emphatically over and over again is to say they have asked the Argentine judge for that precise tracing of assets. Where did you say that? Oh, tracing of assets. I'm asking about the discovery. Did they – did you tell Judge Hallerstein that they – We did not. Excuse me for a second. Yes. Did they tell Judge Hallerstein? Did you tell Judge Hallerstein? Look, they've already answered this in Argentina, and they'll get it through Argentina. They don't need to be here. Did you tell them? Not these subpoenas. No, you didn't tell them. Not these subpoenas. Right. But the reason why is because these subpoenas are on their face, facially invalid. They are so overbroad, they would never get past Rule 26, Judge. Well, that doesn't make them invalid. It makes them a reason to pair them or to limit them in some ways. And we ask the judge, at a minimum, to do that, at a minimum, if they are entitled to these documents. So one of the things you're looking for is a remand to at least reduce the scope of those subpoenas? We are not asking for that, Judge. Not at this point. You don't want that? Not at this point. And the reason why is the following. Do you want a straight-up affirmer or reverse? We want a remand with an instruction to Judge Hellerstein to comply with what this court has done in both Kiobo, In re Twine, and in re Ranoff. Can I shift? I know there's two issues. One is, is there even an ongoing proceeding in connection with this is for use, right? And I understand we're reviewing that de novo. And I'm finding some tension between things that you're saying about, oh, these are proceedings that have been going on for 20 years. And you're saying there were no proceedings because they were dismissed. So I'm looking, it's Joint Appendix 154, I think, is the order that you talk about a lot. And I just, I'm, you know, obviously we're trying to interpret different language from different legal systems, right? So it says that the request has become abstract. I don't know whether that means it's become moot or whether, what does that mean? So that's a reference, Judge, to a separate proceeding. They had sought a ex parte proceedings, the appellees had, in front of the Argentine judge. Okay. But my client became aware of it and so intervened. And therefore, what they meant, I think, was essentially it's moot, the ex parte. The ex parte, all right. So at that point it says, okay, you haven't complied with certain requirements. When I scroll down a couple of pages, it looks like there's another order. I think it's Joint Appendix 163. It's also dated May 24, which, again, I think is before the request here. And it says, A, I'm confirming I have jurisdiction to hear the attested succession proceedings. B, I'm essentially opening one and I give any people who claim to be heirs 30 days to make their claim. Doesn't that suggest that there was, in fact, an open proceeding because these folks are making claims as heirs? It does. And that's the point, Judge. And we were trying to make the point is that they could have gone back to comply with these procedural defects. Okay. So now you're on the intel piece. You've made two arguments on appeal, right, if I'm understanding it. And the first argument is there was no proceeding in connection with this is for use, right? It was the for use piece. And at that time there was no ongoing proceeding because they had not complied with those.  But doesn't this order that I just pointed to signify that there is an ongoing proceeding? We're acknowledging my jurisdiction to hear the present attested succession proceedings. And if you're a claimant or creditor, you have 30 days to make a claim. That sounds like an open, ongoing proceeding to me. So, again, one thing that I had hoped we would be able to do is suss this out at a hearing in front of Judge Hedlonstein after we brought to his attention. Okay. But we're here now. And there's no record on this, Your Honor. I'm looking at it. Tell me what the alternate interpretation is that would require a hearing. What is it that you would have presented to Judge Hedlonstein to prove that there was no hearing? So if you look at just language, just on 165, JA-165, for example, there's a number of references that says prior, for example, item 3. There's Roman numeral 3. Do you see that, Judge? Yeah. There's a whole bunch of things that say before I can issue an order, you've got to comply with the thing. I'm pointing you to the prior page, though, because I'm looking at the language that's telling me, suggesting to me there is an open proceeding, and I'm looking for your response to that. In the middle of JA-164, I guess it's 1, 2, 3, the fourth paragraph down, where it says, since the death has been proved and the death certificate is attached, I declare his intestate succession proceedings open. And then it says heirs, creditors, and all those who consider themselves entitled are summoned to prove it within a 30-day term. Am I misunderstanding that as signifying that there is at that moment an open proceeding, like the words that they said? And if there's some reason that doesn't mean what it says, tell me what that reason is. So the short answer is I'm not sure exactly what that language means. What we relied on, Your Honor, is the partition action. This is what you're reading from is the intestate action. So could you explain the relationship between these? Because I really struggle to understand that. Okay. As I understand it, the intestate action began in 2003. So that's essentially the contestation that the appellees brought seeking entitlement to Pinchos' estate. So that's what this is, the intestate action. So in other words, declaring it open in 2024, it's reopening it essentially. It appears to be, Your Honor. Okay. What happened is that in the partition action, which was a separate action brought later in 2022 by the appellees, they sought discovery of tracing, according to them, for purposes of tracing Akiba Foundation assets to Marlin and Benjamin. So tell me, and, again, I know we're talking in a different legal system, but when you say a partition action, what is it they're seeking to partition, the proceeds from that trust? That's my understanding, is that they're actually looking to reestablish the Akiba Foundation's assets as being owned by Marlin and Benjamin Kipper Band, and they're seeking a share of those assets. Go ahead and finish your answer. And that's what, again, as I understand it, that's what the partition action seeks to do. The order that you're telling us denies that discovery. The partition action. Where is the order? Show me in the record. Yes, so if you look at 154, Your Honor, JA 154. All right, that's what we were looking at. So you're saying that the thing 10 pages later is from a different proceeding. Which, correct. But why aren't they talking to each other? Don't you just need one open proceeding? No. No, because the discovery where they said they want judicial assistance for purposes of is in connection, as I understand it, in connection with the partition action. Because that's where the Akiba assets, foundation assets, are at issue. Well, aren't they at issue in both, right? Because if they are and should have been part of the estate, right, that one mechanism would be to, again, we're all talking about a law that is our own. And it could be, Your Honor. It's just that their record is completely undeveloped on this. And I think Judge Park's question really gets, and I want to answer that question, because, Judge Robinson, after all of this, what happened is in Argentina, the Argentine judge reinstigated all of this and is now taking pleadings. And so the for-use argument that I was making in front of Judge Helmerstein has largely been mooted by the fact that the Argentine proceedings are now active again. So that makes sense. And what puzzled me about your argument is because I thought what you were saying is not, oh, our argument is mooted and it's off the table because clearly these proceedings are ongoing. I understood your argument to be, blah, blah, blah, we don't hear you. We can't pay attention to the fact that the proceedings are ongoing because that knowledge wasn't available to Judge Helmerstein at the time, which seemed odd. So my point there was just procedurally. When they inject new developments in Argentina that Judge Helmerstein could never have even reviewed because he issued his order before that, the appellate record, I was just making the point that the appellate record is static. You're not denying that the for-use argument is moot at this point, given the ongoing proceedings? With respect to whether there is an ongoing proceeding, yes, Your Honor. Okay. I'm not denying that. All right. So now we're to the intel conversation that you were having with my colleague. Yes, Your Honor, but with one proviso. The for-use, there was two arguments I made with respect to the for-use argument. One was there's no viable proceedings below, which is now mooted. The other is that the request that they made, the subpoenas that they issued, could not have been for-use in any relevant proceeding in Argentina because what they're so broad, it's effectively an asset-tracing exercise. Right. And that was the argument that I was suggesting. Okay. That feels more like the over-breadth argument. It does definitely overlap absolutely with that argument, and I'll get Judge. No, that doesn't add. But I do want to get to the intel one factor because I think it's dispositive, Your Honors. I really do. In both Ranoff, which Judge Park was part of the panel in February 22nd in affirming the Ranoff decision, in Ex Parte Klein, in Chilbo, this Court has made abundantly clear over and over again, if the adverse party from whom the discovery is really being sought is actually in that foreign proceeding, that militates against the judicial proceeding. What does it mean if, and this gets back to my colleague's question, if it can be established that the same discovery was available with authority from the foreign proceeding? In other words, if the Argentine court, if you never argued that the Argentine court could have secured for the parties the same information through a subpoena to the banks, then that reasoning doesn't apply. Am I missing something? So there's a distinction between the subpoenas as framed, and I never argued that the Argentine court could get the subpoenas as framed issued against U.S. banks. It couldn't. It couldn't. Because? Because they're too broad. They're just too broad. So it's not that there's not authority. Yeah, okay. But the other point, Judge Wesley, and I want to make this clear because I didn't get a chance to make this clear. The appellees in Argentina had previously sought letters rogatory. Again, the record is completely unclear as to what happened with those, but we do know from the appellee's own submission that the court had ultimately denied those letters rogatory. The record is unclear on this. Your client wasn't on notice of what was going on there? She was on notice in Argentina. Then how would you not know what happened? Well, so as I understand it. I mean, I find it curious. Your client interjected herself here. Rightfully so. To some degree, she has an interest. But this is about bank records. This is not that it happened to be hers. But some of which clearinghouse, the clearinghouse, it has nothing to do. The clearinghouse is relevant to Germaine in some ways, but the clearinghouse isn't in the Argentine proceeding, nor is the clearinghouse in any way carried. I mean, it's got records of transactions involving her, but they're not her records in that sense, are they? No. So, Your Honor, this court in Klein in February, again, affirmed Judge Engelmeyer's decision saying that it was, and this is intel number one. If, again, it's not, Judge, it's not whether the subpoenas as framed in the United States can be replicated in the foreign proceedings, that is not the test. It can't be. Because where we're arguing that the subpoenas as framed are grossly overbroad, no court should be condoning something like this. The test is, what is the applicant trying to get? And if what they're trying to get here legitimately can be gotten in the foreign proceeding, then intel factor one says it doesn't belong here. How long has your client had access to this trust? This was in 2000, since 2002, Your Honor. Let me ask you a question. If indeed this was part of the estate and the children were entitled to a distribution of it, and she regularly spent money from that trust, disproportionate to her interests, do the children have an interest in knowing that she spent that money? Do they have an interest? Presuming those facts. Presuming those facts, yes, Your Honor. How else are they to find out other than looking at her bank records and the transactions from that trust? They've asked for that specific information in Argentina, and they will continue to do that. That will continue to be litigated. From whom? From the Argentine judge, Your Honor. No, no. From whom? Who have they asked it from? From her? From her. How do they know if she's telling the truth without having the bank records? Well, again, this is. What would you do? Would you do the deposition with the bank records in your hand, or would you do the deposition of her first and then seek the bank records? These are all questions that the Argentine judge can handle, Judge. There's no reason for the U.S. courts to be involved here. There's none.  I think we have your argument. You're preserved a few minutes, Your Honor. Okay.  Mr. Vanderbilt. Whenever you're ready. May it please the Court. My name is Thomas Vanderbilt from Kellner, Hurley, Gideon, Friedman, and I'm the applicant appellees in this case representing Dusan, Ivan, and Mara. You can raise that. No, no. You can raise the button. There's a button on your right. The switch right there. This here? The switch right underneath. You can raise it up. I'm sorry. I'm not. Yeah, just press. Right. This one? Ah, look at that. This is so modern. I have to admit. This is the Second Circuit. And I have to admit, this is my first document in the Second Circuit. There you go. Okay. Well. So this case is a typical 28 U.S.C. 1782 application for obtaining intermediary bank discovery when you have foreign claims of asset concealments, fraud, fraudulent conveyance. This is typical. And Judge Ehlerstein certainly did not abuse his discretion in granting the application. I could go into all the factors one by one, and I'm happy to do this, the statutory factors and the four non-exclusive factors, but I think I'll get right into the meat of this argument having heard opposing counsel. They essentially rely on two cases, Klein and Kielbo, when there are dozens of cases that are going our way and that are clearly distinguishable from Klein. I know why they rely on Klein. Klein is, it's true, about a foreign probate proceeding in Brazil for Klein, in our case in Argentina, and the foreign allegations are the same, that some of the heirs have taken money, concealed money from other heirs. But this is really where the similarity ends. Despite what you've heard, we are not seeking broad discovery. We're not seeking the same discovery at all as they did. Before we get into breadth, can we talk about for use? The district court didn't say anything about how it would be used. It just said that it would be. It was very conclusive. I think it was one paragraph or so. So can you maybe explain how the discovery you're seeking would be for use? Yes. Well, first of all, the standard is that for use, so long as you can garner some benefits, and I'm happy to cite to some cases, this is sufficient to satisfy the for use requirement. You don't need to establish it in great detail. I know the standard. I'm asking for this case, your claim.  So we're doing intermediary bank discovery. We're seeking a photograph at the level of the banks that are in this district in the business of doing intermediary bank of wire transfer in U.S. dollars from anywhere in the world to anywhere in the world who transits through New York at the level of the intermediary banks. Those banks have zero relationship with the interveners or with any of the discovery targets. Nothing that we know of. This is not why we want to subpoena them. We want to subpoena them in order to trace the money, discover, recreate the puzzle, if you will, from 2002 through today of what happened to the funds that we are to... So kind of your fishing. So hopefully, probably there's not much that's relevant. But hopefully for your client, there's some records of over $5,000 transactions of Akiba assets going out. Is that right? Is that fair? I admit it's a big net that we're casting, but it's not a fishing expedition. It's classic. I will cite to many cases, and in fact, I have... I don't need the cases. I'm just trying to understand the logic of the for use right now. Understood. So then you find these transactions, and then what do you do with them in Argentina? So let's say you get the discovery from Judge Hallerstein, from the 14 banks, and then you find this hypothetical document. What then? Well, then we are going to... I mean, our clients are going to give that information, to inject that information into the Argentine proceeding so we can reconstruct the full probate assets so it could be properly distributed in accordance with Argentine law. Okay. So which action and what do you mean by inject? Both actions. We're seeking the documents for both actions. And, I mean, I'm not an Argentine lawyer, and I'm not going to speculate about Argentine law, but my clients are going to present these spreadsheets because that's all we're going to get. And, in fact, we already got response from three banks before this state was in place, and all we received is all what we asked is a spreadsheet, an Excel spreadsheet, with no specific private information, just the beneficiary of the transfer, the originator of the transfer, the amount, and the account numbers. So I presume... So let me switch gears. So that's suggesting that the banks have complied with these subpoenas and they weren't at all burdensome. Three of them have, and three have already responded that they did not have responsive records, and then this state was in place, and so there was no more discovery after that. So what this tells you then is, A, it tells you whether a bank in any way may be involved in dollar transfers, and the target is the bank accounts of the trust? The trust and others. On our subpoena, it's appendix to page 5 and 7, 5 through 7. You will see that we are only seeking 10 discovery targets that we believe are related to Marlene, the intervener. The intervener is claiming that she could produce the documents, but she could not, unless she admits that she is the alter ego of the nine other discovery targets, which she has not. She has no relation to them, and the only way we can get the discovery is to do it here in the U.S., in New York specifically, because it's the center of intermediary banking in U.S. dollars. That's the only forum where we can do that, and why do we do it here? Because that's the only way you can have a global approach. We need this global approach. In Argentina, they can't get those records. So could you tell me a little bit more about that last statement? You said in Argentina they can't get those records, so the Argentine court wouldn't have authority to issue a subpoena to the New York banks that they could open up. That I don't know, Your Honor. What I meant by that is that the intermediary banks here, New York has jurisdiction over them. I don't know that Argentina has jurisdiction over them. That's a question I cannot answer. I assume they do not. The Argentine court definitely has jurisdiction over Marlin, but maybe over Argentine banks that are located in Argentina. I don't believe they have. I don't know. I'm not an Argentine lawyer, but I don't believe they have jurisdiction over these New York banks that are in the business of doing this correspondence slash intermediary banking. That's why we need to do it here, and that's the only way. As Judge Weasley said earlier, if we ask the document from Marlin, first of all, she would only have her own bank records, and how am I to know that she's going to produce everything about her assets, alter egos, et cetera? The truth is the records we're seeking here are not records of Marlin, unlike Inclined. Inclined has sought everything, KYC, communications, signatory cards, bank statement, cancel check, everything. We're asking for none of that, and in fact we're not getting none of that. We're asking for one spreadsheet per bank or the clearinghouse that is generated by the banks. Does it tell you the specific transactions, or is it a summation? No, we're asking for any wire transfers involving the 10 discovery targets that are listed, I believe generally pending seven on our subpoena. Have any of the banks asserted opposition based on burden or overbreadth? None of them, Your Honor, and in fact I have some experience. This is my first time in the Second Circuit, but it's not my first time doing intermediary bank discovery. I do this on a routine basis. I've done it probably dozens of times. Banks never object, never move to quash because it's simple. They essentially spit out, if you allow me, an Excel spreadsheet. It's a document they can create in no time that they do in the regular course of business. We're not asking to go through thousands of pages. We're not getting thousands of pages. We're getting one spreadsheet per bank. I've done it many times. I've cited in my declaration nine other cases. I could have cited more where this is done. It is a classic tool that's used by many practitioners to obtain the – when there are claims abroad of concealment of assets or fraud or fraudulent convenience, obviously the knowledge of the fraud is solely within the fosters, and they don't disclose where the assets are. They purposely hid them through sometimes shell entities, et cetera. They're transferred from Geneva to the Bahamas. It's very complex. And this is a classic tool, the intermediary bank discovery that we're seeking here, to do justice, to be able to reconstruct the puzzles of the fraud, which is always, in this day and age, on a global stage. This is the most efficient, practical way to do it. I'm happy to cite two cases here where it's been found. If you allow me, I will do it right now. To show that Judge Ehlerstein was only in the footsteps of other judges, I can cite the Abraj Investment Management Limited. It's a recent case with the District Court from 2023, 20 MC 229. And in that case, they basically had the same subpoenas that we have. I'm quoting from the decision. The subpoenas that applicants propose to serve on the banks are limited to documents and information in relation entirely of USD transactions and transfer made by the transferees during the period from January 1, 2009, through June 18, 2018. This is not unduly burdensome or intrusive, as the materials applicants seek through the subpoenas are routinely produced by banks to satisfy discovery requests. Further down, the court noted that correspondent banks should be able to search for and produce the records of wire transfer without significant burden. There are many cases like this, and the distinction with Klein does not apply. I would also add that in Klein, the court had denied the application. So the review by the Second Circuit was the abuse of discretion of denying. Here, Judge Ehlerstein has granted the application, has denied the motion to quash the subpoenas, has denied the motion for a stay, and he certainly did not abuse his discretion, which is the applicable standard here. A few other points, if you'll allow me. Yes, I would also ask the court to address the issue of the stay, and of course, from my perspective, that if the court is inclined to rule in favor of the appellees, that it lifts the stay. There's a separate motion for a stay. On October 29, 2024, there was a ruling stating that this would be ruled upon on an expedited basis, but that for the time being, it would be submitted to a panel, and we still don't have a ruling. There was never a ruling on the motion. There was a temporary stay subject to an expedited review, and that has not happened yet. So I'm respectfully requesting a ruling on the motion to stay. Let me add also that there's nothing in the record that the proceedings were stayed. There was a discussion earlier with counsel about that. There's nothing in the record, and this is his burden. It's not for the court to guess. Going back to the four non-exclusive factors, there's no attempt to circumvent anything here. There's an argument about letters rogatory being denied, and the idea is they sought this very same discovery in Argentina and were denied and then came up here. It's not the same discovery. I'm not intimately familiar, Your Honor, to be honest with that particular point. Well, it's important. Can you tell me what the letters rogatory sought and point me to the record? I do not know, actually, in particular. I know this is not the same discovery. It's just impossible. But, yes, my clients for 20 years, well, my clients, their father died, Jacobo, in 2022. So my clients are son and daughters. They've only been solely involved for two years here or three years now, maybe. So since their father died, my clients have only been trying to assemble the entire probated estates, and, yes, they tried different ways before starting this 1782. But there was never a prohibition to file this 1782. There's nothing in the record, and there's nothing because it didn't happen. There's no proof-gathering restrictions in Argentina, and there's nothing in the record about this. I will cite the Federal Republic of Nigeria versus VR Advisory Services, a Second Circuit case of 2022 where the court found that the courts are not free to read extra statutory barriers to discovery into Section 1782 under the guise of exercising their discretion. The same case reminded that the appellant had the burden to demonstrate proof-gathering restrictions. Now, in their brief, what did appellant wrote? They wrote, quote, page 19 of their brief, docket number 44, here, while the record does not definitely establish that appellees were trying to circumvent the Argentine court's adverse rulings, all the circumstances, which appellees still refuse to explain, surely pointed out such an effort. They don't know, and they would like us to explain this is their burden. They are parties to all these proceedings in Argentina. There's just nothing. They could have produced an affidavit from an Argentine attorney saying what they want to say, that there's a restriction, but there's none. On the other hand, we produced the declaration of Guillermo Jorge, the counsel for Maclean's Argentina, who under oath stated that there's no such restrictions. I don't know if my time is up. I haven't touched about the privacy concerns and the privacy issues. You can go ahead. Okay. So here, unlike in Klein, I have to talk about Klein because that's all they talk about. Unlike in Klein, the banks that were subpoenaed in here that we want to subpoena and the clearinghouse are not the agent of Malin. They have zero relationship. In Klein, the attorney who was the proponent of the discovery apparently represented to this court that he had some recollection that some heirs had bank accounts here in New York. This is completely different. We claim zero relationship. Again, this is intermediary banking, and what we're going to get and what we get, I guess I'm repeating myself, but it's only a spreadsheet. There's nothing private, and if there was anything, any privacy concern, which, by the way, would only apply to Malin and not to the other nine discovery targets, unless, again, she claims to be all the ten discovery targets, but she hasn't done so. But a protective order could have been ordered. Judge Ellerstein repeatedly suggested that a protective order could resolve any privacy concern issues. The other side never took the bait. They always wanted just this application to be denied fully. They never entertained the idea of a protective order. Why? I have my answer. I think they simply want the truth not to come out at all cost. They don't have legitimate privacy concern. This is just a trick, if you'll allow me. I think we have your argument now. Thank you very much. Thank you. It was a wonderful rebuttal. Just some sharp points in response. My colleague admits it's a big net. It's a big net. And to your question, Judge Wesley, you said, are the trusts named in the subpoenas? They are not. There's no reference to Pinchos, the testator. There's no reference to the foundation, Akipa. The subpoena asks for every document, every transaction, every bank transaction over $5,000 from 2002 to the present that bears my client's name, her children's name, her brother and their children's name. No reference to Akipa or Pinchos. This is why this is a pure fishing expedition. This is not just a big net. This is a big net with extremely fine meshing, and it's going to take everything. And their view, Judge, is that they want to get everything, and they'll make a decision as to what they can and cannot use in Argentina. That's not the test. That's not the test under Klein, the discord, again, affirmed here just a few months ago. It's really hard to draw a lot of significance. When we're reviewing something on an abusive discretion standard, you can have the exact same subpoena in the exact same factual situation and get an affirmance for two contrary rulings, right? That's the nature of abusive discretion review. So I'm just trying to figure out how, unless there's something we say in Klein that's sort of a statement of law that is at an abstract enough level and we rely on a presidential opinion that it came from, I don't know how any of these individual cases are determined. I think that's a great, great point, Judge, and I would point, Your Honor, to Klein's, this Court's, language. It wasn't just that they were saying, well, it's an abusive discretion, we're not finding an abuse. The Court went on to say, quote, courts within our circuit have denied expansive requests similar to Saul's. It was a separate comment and finding and noting by this Court, and they cite Baltic Saul, which is one of the cases we cited in our briefs, and their parenthesis is a petitioner's 1782 request concluding that the fourth factor weighs heavily, where they sought discovery from 11 large international banks as to seven different business entities, close quote. I think that is an affirmative judgment by this Court, Judge Robinson, that not only was Judge Engelmeyer right in saying that the extremely broad subpoenas in that case were not consistent with Rule 26, but that, in fact, it was inconsistent with Rule 26. And in this case, again, Judge Wesley, not only is there no reference to Pinchos or Akiba, it goes to 14 financial institutions. In Klein, there were only 12 financial institutions. Well, we know already that three have said there's nothing there. Three have answered and said there's nothing there, so now you're down to 11. That's true, Judge. And unfortunately, those banks, that kind of slipped through before we could get a stay in order here. But the other point is that in our case— Well, this is different from Klein in several respects. Klein was looking for particularized bank records. This is looking for a series of transactions that go through the Fed window that are dealing in U.S. dollars. They're not looking to look into your client's bank book. They're looking to look into the records of banks where there have been transactions in dollars, all $5,000, right? So if she had a transaction for $4,000, they don't get it. It's particularized in that way. If she dealt in another nation's currency, they don't get it. They're not asking for her bank records. They're asking for when banks that she may have been—have accounts with did dollar transactions. That's what they want. But, Judge, first of all, I think the Klein subpoenas were much broader than— Believe me, every single one of us has read Klein four times before today. Okay. Thank you. The— At least four times. Their subpoenas as framed would take a $6,000 transfer, for example, just as a hypothetical, that my client would have paid to a hospital for medical bills. It would capture that. If this were an asset, if this is an asset of the estate and there's been 20 years where she's had exclusive use to it, are they entitled to have some knowledge with regard to what she did with the money? They are, Judge. And that is precisely what's before the Argentine judge. All right. And the other thing that I want to— Why don't you wrap up briefly? Yeah, Sean. The only other point that I want to make in response to this, he said that all they're asking for is spreadsheets. That's not accurate. The subpoenas call for, quote, as well as bank records relating thereto. The subpoenas go on and on about the extent to which they want to cast that net very broadly with very fine mesh. And I believe, Your Honor, that if you apply Klein and all the other cases, Ranoff, all the other cases, this subpoena should never have been approved. It's just too broad. Thank you. Thank you, counsel. Thank you both. We'll take the case under advisement. The remaining cases on the calendar for today are on submission.